AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT
2/1/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VAM _____ DEPUTY

United States of America

v.

FRANK EDWARDS, MANUEL SANTOS, and
AUBRY LEAL,

Defendants

Case No.   2:22-mj-00423-DUTY

**FILED**
CLERK, U.S. DISTRICT COURT
2/01/22
CENTRAL DISTRICT OF CALIFORNIA
BY: eb DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the dates of January 31, 2022 in the county of Los Angeles in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1708 | Possession of Stolen Mail |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
/s/ Michael Durocher
*Complainant's signature*

Michael Durocher, USPIS Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   2/01/22

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Margo A. Rocconi, U.S. Magistrate
Judge   *Printed name and title*

AUSA: Elia Herrera (x2024)

**<u>ATTACHMENT A</u>**

<u>PROPERTY TO BE SEARCHED</u>

The following digital devices (the "SUBJECT DEVICES"), seized on January 31, 2022 and currently maintained in the custody of the Beverly Hills Police Department in Beverly Hills, CA:

- A black iPhone that was recovered from the driver's seat of the car in which AUBRY LEAL, FRANK EDWARDS, and MANUEL SANTOS were sitting before they were arrested ("SUBJECT DEVICE 1");

- A red iPhone 12 with IMEI 353043119433095 that was discovered in EDWARDS' pants pocket ("SUBJECT DEVICE 2"); and

- A silver iPhone in a gold case with IMEI 354444065545636, discovered in a bag that also contained LEAL's identification ("SUBJECT DEVICE 3").

## ATTACHMENT B

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 1708 (Mail Theft and Possession of Stolen Mail), 371 (Conspiracy), 1344(2) (Bank Fraud), 1029(a)(2) (Use of One or More Unauthorized Access Devices), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), namely:

a.   Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than LEAL, EDWARDS, and SANTOS, such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

b.   Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

c.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

      d.   Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

      e.   Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

      f.   Records, documents, programs, applications, or materials relating to United States mail or mail matter;

      g.   Contents of any calendar or date book stored on any of the digital devices;

      h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

      i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

      j.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      k.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

l.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

m.   Audio recordings, pictures, video recordings, or still captured images of United States mail or mail matter, whether opened or unopened, or relating to the possession or distribution of drugs or the collection or transfer of the proceeds of the above-described offenses; and

n.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

a.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv. evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v. evidence of the times the device was used;

        vi. passwords, encryption keys, and other access
devices that may be necessary to access the device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii. records of or information about
Internet Protocol addresses used by the device;

        ix. records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2. As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

3.   In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies

of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.   During the execution of this search warrant, law enforcement is permitted to (1) depress MANUEL SANTOS, FRANK EDWARDS, and AUBRY LEAL's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device

has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of SANTOS, EDWARDS, and LEAL's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

    6.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**<u>AFFIDAVIT</u>**

I, Michael Durocher, being duly sworn, declare and state as
follows:

## I.   <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal
complaint and arrest warrant against Aubry Leal (hereafter
"LEAL"), Frank Edwards (hereafter "EDWARDS"), and Manuel Santos
(hereafter "SANTOS") for a violation of Title 18, United States
Code, Section 1708 (Possession of Stolen Mail).

2.    This affidavit is also made in support of an
application for a warrant to search the following digital
devices in the custody of Beverly Hills Police Department, in
Beverly Hills, California, as described more fully in Attachment
A (collectively, the "SUBJECT DEVICES"):

    a.    A black iPhone ("SUBJECT DEVICE 1"), that was
recovered from the driver's seat of the car in which LEAL,
EDWARDS, and SANTOS were sitting before they were arrested;

    b.    A red iPhone 12 with IMEI 353043119433095
("SUBJECT DEVICE 2"), discovered in EDWARDS' back right pants
pocket; and

    c.    A silver iPhone in a gold case with IMEI
354444065545636 ("SUBJECT DEVICE 3"), that was discovered in a
bag that also contained LEAL's identification, which was found
on the rear seat of the vehicle.

3.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of
Title 18, United States Code, Sections 1708 (Mail Theft and

Possession of Stolen Mail), 371 (Conspiracy), 1344(2) (Bank
Fraud), 1029(a)(2) (Use of One or More Unauthorized Access
Devices), and 1028A (Aggravated Identity Theft) (collectively,
the "Subject Offenses"), as described more fully in Attachment
B.  Attachments A and B are incorporated herein by reference.

     4.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

     5.   I am a United States Postal Inspector assigned to the
Los Angeles Division of the United States Postal Inspection
Service ("USPIS") and have been so employed since April 2017.  I
am currently assigned to the Los Angeles Mail Theft Team,
domiciled in Los Angeles, California, which investigates
violations of Federal law, including identity theft, mail theft,
wire fraud, mail fraud and bank fraud.

     6.   I have had the following education and training: I
received a Bachelor of Arts Degree in History and Political
Science from the University of Mary Washington in 2007.  I
received twenty weeks of federal law enforcement training at the

Federal Law Enforcement Training Center in Artesia, New Mexico
and the Federal Air Marshal Academy in New Jersey.  I served as
a Federal Air Marshal with the Federal Air Marshal Service for
approximately seven years.  I received twelve weeks of Basic
Inspector Training at the Inspection Service's training academy
in Potomac, Maryland; a federally accredited law enforcement
academy.  The training covered various aspects of federal law
enforcement, including the investigation of the Subject
Offenses.  During my employment as a Postal Inspector, I have
participated in investigations involving the theft of mail,
identity theft, bank fraud, mail fraud, and wire fraud.  I have
interviewed witnesses and cooperating individuals regarding
theft of mail, identity theft, bank fraud, mail fraud, and wire
fraud, and have read official reports of other agents and
officers regarding such interviews.  I have also been a case
agent in charge of specific investigations involving identity
theft, mail theft, bank fraud, and wire fraud.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   On January 31, 2022, at approximately 2:50 AM, Beverly
Hills Police Department officers conducted a traffic stop on a
blue Hyundai Genesis with California registration 8WGM716
(hereafter "SUSPECT VEHICLE") because the SUSPECT VEHICLE failed
to come to a complete stop at a flashing red light.  When the
officers approached the SUSPECT VEHICLE, they encountered
SANTOS, who was in the driver's seat, EDWARDS, who was in the
front passenger seat, and LEAL, who was in the rear passenger
seat.  When SANTOS failed to produce insurance documentation for

the SUSPECT VEHICLE, the officers detained LEAL, EDWARDS, and
SANTOS.  While the officers were handcuffing the SUSPECT
VEHICLE's occupants, they observed a loose, green leafy
substance resembling marijuana in the rear left passenger area
and on the driver's side floorboard.  In addition, the officers
observed an open alcoholic beverage container in the front
passenger door.  The officers conducted a vehicle search and
they discovered numerous envelopes, checks, and two California
driver's licenses that did not belong to the SUSPECT VEHICLE's
occupants.  Furthermore, officers discovered numerous devices
commonly used to steal mail out of United States Postal Service
("USPS") collection boxes[1].

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

8.    Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

**A.    Officers Stop and Detain SANTOS, EDWARDS, and LEAL and
See a Substance Resembling Marijuana and an Open
Alcoholic Container**

9.    On January 31, 2022, at approximately 2:50 AM, Beverly
Hills Police Department officers conducted a traffic stop on a
blue Hyundai Genesis with California registration 8WGM716
(hereafter "SUSPECT VEHICLE") because the SUSPECT VEHICLE failed
to come to a complete stop at a flashing red light.  When the

---

[1] The devices are long, thin pieces of material that are
covered with a glue-like substance.  Occasionally, individuals
will affix a rodent glue trap to the end of the device.
Individuals feed the device into the opening of a USPS
collection box and then they pull the device out when envelopes
stick to the glue on the device.

officers approached the SUSPECT VEHICLE, they encountered
SANTOS, who was in the driver's seat, EDWARDS, who was in the
front passenger seat, and LEAL, who was in the rear right
passenger seat.  When SANTOS failed to produce insurance
documentation for the SUSPECT VEHICLE, the officers asked SANTOS
to exit the vehicle, but he refused.  After numerous verbal
requests to have SANTOS exit the vehicle, officer restrained
SANTOS and detained SANTOS, EDWARDS, and LEAL.  While the
officers were handcuffing the SUSPECT VEHICLE's occupants, they
observed a loose, green leafy substance resembling marijuana in
the rear left passenger area and on the driver's side
floorboard.  In addition, the officers observed an open
alcoholic beverage container in the front passenger door and a
device commonly used to steal mail on the front passenger
floorboard.

>    **B.   Officers Search the Subject Vehicle and Find
>         Approximately 100 Pieces of Mail and Materials
>         Commonly Used to Steal Mail**

10.  After SANTOS, EDWARDS, and LEAL were detained, the
officers conducted a vehicle search and they discovered
approximately 100 pieces of mail and checks in the driver's seat
sun visor, on the front passenger floorboard, and on the rear
right passenger floorboard.  In addition, two California
identification cards were found in the SUSPECT VEHICLE.  The
names on the pieces of mail, checks, and identification cards
did not match any of the occupants' names.

11.  Furthermore, officers discovered three devices
commonly used to steal mail out of United States Postal Service

("USPS") collection boxes.  The devices were long, flexible strips of material with a weighted object attached to one end. In addition, each device was covered with rat trap glue.[2] The officers located one device on the front passenger floorboard, which was between EDWARDS' feet when the SUSPECT VEHICLE was stopped.  When it was discovered, the device had mail stuck to it.  Two additional devices were located on the rear left passenger floorboard, which were inside two separate bags. Furthermore, officers recovered packages of rat trap glue from the rear left passenger floorboard.  When EDWARDS was detained, officers observed a sticky substance on his hands consistent with the glue on the devices.

**C.    Officers Arrest SANTOS, EDWARDS, and LEAL for the Stolen Mail and Possession of Burglary Tools and Law Enforcement Interview Them**

12.  Based on the items discovered in the SUSPECT VEHICLE, the officers arrested SANTOS, EDWARDS, and LEAL and transported them to the Beverly Hills Police Department.  Beverly Hills Police Department notified the United States Postal Inspection Service of the arrests and Postal Inspectors responded to the Beverly Hills Police Department to interview SANTOS, EDWARDS, and LEAL.

13.  On January 31, 2022, at approximately 10:00 AM, law enforcement read LEAL her rights and LEAL signed an Advice of Rights form acknowledging that she understood her rights.  LEAL

---

[2] When the devices are inserted into a USPS collection box, the weighted object enables the device to drop to the bottom of the box.  Mail pieces stick to the glue on the device and allow the user to get the mail.

stated SANTOS picked up LEAL and her boyfriend, EDWARDS, on
January 30, 2022 around dusk.  In the beginning of the
interview, LEAL stated that they drove around all evening and
she did not know anything about the mail, checks, or devices
discovered in the vehicle.  Later in the interview, LEAL said
SANTOS drove her and EDWARDS to Culver City, California and
parked at a United States Post Office.  LEAL stated SANTOS used
one of the flexible devices with a rat trap to retrieve mail
from the Post Office, but she did not know how the device
worked.  LEAL further stated that when SANTOS retrieved the
mail, he put the mail on the SUSPECT VEHICLE's floorboard.  LEAL
stated EDWARDS opened the mail and SANTOS threw the trash away.
LEAL stated the devices and rat traps belonged to SANTOS.  LEAL
stated they stopped approximately three or four times to steal
mail from various locations.  LEAL said she did not steal any
mail and had nothing to do with it.

14.  On January 31, 2022, at approximately 11:31 AM, law
enforcement read EDWARDS his rights and EDWARDS signed an Advice
of Rights form acknowledging that he understood his rights.
EDWARDS stated SANTOS picked up EDWARDS and his girlfriend, LEAL
from a friend's home, to take them home.  EDWARDS said they
drove to a restaurant to get food and then they "smoked"
afterwards.  EDWARDS stated they did not drive to any location
other than the restaurant.  When law enforcement inquired about
the sticky residue on his hands, EDWARDS stated the residue was
from something on the SUSPECT VEHICLE's floorboard that he had
to pull off of his shoes, but he did not know what it was.  When

law enforcement asked him if he knew anything about the mail or checks in the car, EDWARDS stated he did not know anything about those items and he insisted that he was only in the vehicle so SANTOS could give him a ride home.  Furthermore, when asked why he was in Beverly Hills, EDWARDS said he did not know because SANTOS was driving.  After multiple questions concerning the items discovered in the SUSPECT VEHICLE, EDWARDS invoked his right to counsel and law enforcement ended the interview.

15.  On January 31, 2022, at approximately 12:08 PM, law enforcement read SANTOS his rights and SANTOS signed an Advice of Rights form acknowledging that he understood his rights.  SANTOS stated the SUSPECT VEHICLE belonged to his half-brother, who resides in the same residence.  When law enforcement asked SANTOS what he was doing on the morning of January 31, 2022, SANTOS stated he was out with EDWARDS and LEAL.  SANTOS said he knew EDWARDS through his girlfriend because LEAL and SANTOS' girlfriend are friends.  When law enforcement asked additional questions concerning his activity that morning, SANTOS invoked his right to counsel and law enforcement ended the interview.

## V.  **TRAINING AND EXPERIENCE REGARDING THE SUBJECT OFFENSES**

16.  Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.  People who steal mail are often involved in fraud and identity theft crimes.  These individuals usually steal mail looking for checks, access devices, other personal identifying information (such as names, Social Security numbers, and dates

of birth), and identification documents that they can use to fraudulently obtain money and items of value.  Mail thieves often retain these items of value from stolen mail in order to make fraudulent purchases or sell the items to others in exchange for cash or drugs.

b.   It is common practice for individuals involved in mail theft, identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

c.   Oftentimes mail and identity thieves take pictures of items retrieved from stolen mail or mail matter with their cellphones.

d.   It is also common for mail and identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.

e.   It is common for mail thieves, identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital devices, such as computers.

f.   Based on my training and experience, I know that individuals who participate in mail theft, identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

g.   Individuals engaged in mail and identity theft often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

17.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

18.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel

12

may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked

13

for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who was in possession of a device or had the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SANTOS, EDWARDS, and LEAL's thumb- and/or fingers on the device(s); and (2) hold the devices in front of SANTOS, EDWARDS, and LEAL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

21.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

## VII.  <u>CONCLUSION</u>

22.   For all of the reasons described above, there is probable cause to believe that LEAL, EDWARDS, and SANTOS have committed a violation of Title 18, United States Code, Section 1708 (Possession of Stolen Mail).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 1ST day of
February, 2022.

_____
THE HON. MARGO A. ROCCONI
UNITED STATES MAGISTRATE JUDGE